### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KAREN BAYLOR**<br>2908 Naylor Road, S.E.<br>Apt. 157<br>Washington, D.C. 20020<br><br>**Plaintiff,**<br><br>v.<br><br>**JANET L. YELLEN, CHAIR,**<br>**FEDERAL RESERVE SYSTEM,**<br>**BOARD OF GOVERNORS**<br>20th & C Streets, N.W.<br>Washington, D.C. 20551<br><br>**Defendant.** | **Civil No. _____**<br><br>**Jury Demand** |

## COMPLAINT AND JURY DEMAND

### Preliminary Statement

1.      Plaintiff, Karen Baylor, files this action against her former employer, Janet L.

Yellen, in her official capacity as Chair of the Federal Reserve System, Board of Governors

("Defendant" or "Board") for compensatory damages for injuries she sustained as a result of

Defendant's discriminatory refusal to promote her to the position of Program and Financial

Analyst because of her race and Defendant's subsequent retaliation, in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

### Jurisdiction and Venue

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

3.      Venue is proper in this jurisdiction under 28 U.S.C. § 1391.

**Parties**

4.        Ms. Baylor, a District of Columbia resident, resides at 2908 Naylor Road, Southeast, Apartment 157, Washington, D.C. 20020.

5.        Defendant Federal Reserve System, Board of Governors is the United States' central banking system and is located at 20th & C Streets, Northwest, Washington, D.C. 20551.

**Factual Allegations**

6.        Ms. Baylor earned her Bachelor of Arts degree in 2005, after which the Board hired her in 2006 as a Human Resources Technician (grade FR-35) in the Benefits Section of its Human Resources Department (Management Division). The Board promoted Ms. Baylor to the position of Benefits Administrator (grade FR-36) in June 2007.

7.        In August 2010, the Board promoted Ms. Baylor to Senior Benefits Administrator (grade FR-23) in the Benefits Section of its Human Resources Department.  At the time of her promotion, the Board also appointed Ms. Baylor as a back-up Report Writer for the Staffing Department.

8.        In her role as a back-up Report Writer, the Board provided Ms. Baylor access to its PeopleClick system, a business-intelligence system on which the Board maintained sensitive human resources data about its employees and applicants.  Report Writers accessed the system to generate reports at the request of management, and the Board assigned Ms. Baylor to fulfill this duty when its primary Report Writer, John Martin, was unavailable.

9.        From 2006 through 2011, Ms. Baylor had a successful career at the Board. She had over a decade of work experience in several human resources disciplines and completed nine graduate courses toward her Master's Degree in Human Resources Management.

10.        Board management gave Ms. Baylor "extraordinary" and "outstanding"

performance reviews in 2009-2010 and 2010-2011, respectively. The Board defined those

performance ratings as follows, and reserved both for a limited number of employees:

- Outstanding: "Performance that consistently meets and often exceeds the high

  standards of the job and the expectations of the position."

- Extraordinary: "Performance that substantially and consistently exceeds the

  Board's high standards and expectations."

11.      In April 2011, Jacqueline Raia, a Hispanic female who served as Defendant's

Hiring Manager, posted a vacancy for a Program and Financial Analyst (grade FR-23/24) in the

Management Division. In addition to a bachelor's degree or equivalent experience, the position

required a minimum of two years of specific experience.

12.      Ms. Baylor had all the requisite experience and qualifications for the vacancy

and applied for the position in April 2011.

13.      After Ms. Baylor applied for the vacancy, Ms. Raia cancelled the position.

Ms. Raia subsequently reposted the position at a grade level of FR-25, for which Ms. Baylor

could not apply because she did not possess the requisite years of experience.

14.      Upon information and belief, Ms. Raia acted with discriminatory animus to

prevent Ms. Baylor, an African American, from obtaining the position.

15.      The Board subsequently hired Rina Desai, an Asian female, for the position.

16.      Several months later, on October 20, 2011, Ms. Baylor bumped into Ms. Raia

at the office, and Ms. Raia told Ms. Baylor that she posted a new vacancy for a Program and

Financial Analyst at the FR-23/24 level.

17.      Among other qualifications, the job announcement required that applicants

possess two years of specific experience.

18.     Ms. Baylor's qualifications exceeded the job requirements, and she applied for the vacancy on October 20, 2011.

19.     The following day, on October 21, 2011, Defendant's Recruiter, Terri Sawyer, a Caucasian female, contacted Ms. Baylor about the position, and they met in person on October 24, 2011, to discuss the application process. During their meeting, Ms. Sawyer told Ms. Baylor that although two other internal candidates applied to the position, one of them possessed an "administrative" background and, therefore, did not have the "capacity" to become a Program and Financial Analyst. The individual to whom Ms. Sawyer referred was Tina Holliday, an African-American female who worked as an Acquisition Analyst.

20.     Therefore, Ms. Sawyer told Ms. Baylor that the Board would interview only two candidates—Ms. Baylor and another internal candidate.

21.     Upon information and belief, Ms. Sawyer has a history of refusing to forward qualified individuals' applications for further review. She previously admitted that she does not consider external applicants who have "foreign names," because she assumes they are not United States citizens. Ms. Sawyer's stated prejudice demonstrates a bias against persons of color.

22.     Ms. Baylor later learned that Christopher Benson, a Caucasian male and then an Assistant Recruiting Specialist (grade FR-21), was the other internal candidate.

23.     Initially, the Board assigned Mr. Benson as the recruiter for the Program and Financial Analyst position. Because Mr. Benson was interested in the position, he requested that Ms. Sawyer, a Caucasian who had less experience than several of the Board's African American Recruiting Specialists, manage the hiring process.

24.     Mr. Benson graduated from college in December 2010, after which he began working full-time at the Board. At the time he applied for the Program and Financial Analyst

position, he had acquired ten months of full-time experience in the Board's Staffing Department. During college, he interned part-time in the Board's Staffing Department for seven months.

25.      Because the position required two years of specific experience, Mr. Benson did not qualify for the position.

26.      Mr. Benson acknowledged his lack of qualifications in his cover letter, which stated, "While the vast majority of my recent work experience hasn't allowed me to develop my analytical and quantitative skill sets, this is an area that I focused on in completing my bachelor's degree and I'm looking to further develop in the future."

27.      The Board's internal policy about creditable service requires it to exclude internships and unspecific part-time work during college when it calculates the minimum qualifications for positions at the FR-23 grade.

28.      However, Ms. Sawyer violated this policy and credited Mr. Benson for his part-time internships and college work experience when she calculated his specific experience to make the false claim that he was qualified when he was not, as he did not have two years of specific experience.  Ms. Sawyer and Ms. Raia did not want to promote Ms. Baylor, an African American.

29.      Specifically, Ms. Sawyer credited Mr. Benson: 0.25 years for his part-time internship at American University from May 2008 to May 2009; 0.03 years for his part-time internship at American University from August to September 2009; 0.09 years for his part-time internship at American University from January 2009 through May 2009; 0.19 years for his part-time internship at C'Vent from January 2010 through May 2010; and 0.3 years for his part-time internship at the Board from August 2010 through January 2011.  In the absence of these erroneous credits, Mr. Benson possessed only 1.37 years of unspecific work experience.

30. Further, although the Board performed the credit calculations on November 7, 2011, it credited Mr. Benson for work experience as an Assistant Recruiting Specialist through the end of December 2011.

31. The Board also double-counted periods of Mr. Benson's prior experience. Where one college internship or job ended in a particular month, and another began later that month, Mr. Benson received credit for the full month twice—once in each position. Specifically, the Board credited Mr. Benson twice for the months of May 2009, August 2009, August 2010, and January 2011.

32. Moreover, pursuant to internal policies and practices, the Board did not promote applicants to positions that were two grades higher than their current positions if they failed to occupy their current positions for at least one year. Because Mr. Benson occupied his FR-21 position for only ten months, he was not eligible for promotion to an FR-23/24 position.

33. Despite Ms. Sawyer's knowledge that Mr. Benson was unqualified for the position, she forwarded his application to the Hiring Manager, Ms. Raia.

34. Ms. Raia, a former Recruiting Specialist at the Board, was intimately familiar with the Board's hiring rules and detected immediately that Mr. Benson failed to satisfy the requirement for two years of specific experience. Nonetheless, she proceeded to process his application because she wanted to put an unqualified Caucasian in the position, rather than Ms. Baylor, a highly qualified African American.

35. On October 25, 2011, Ms. Baylor met with Troy Dibley, a Program and Financial Analyst in Ms. Raia's department. Because he occupied the same position for which Ms. Baylor had applied, Ms. Sawyer coordinated an informal conversation between them to discuss the duties of the position.

36.      On November 2, 2011, Ms. Baylor attended a panel interview with four Board employees: Ms. Raia, Leah Middleton (Supervisory Program and Financial Analyst), Kim Spriggs (Senior Administrator), and William Futrell (Project Manager).

37.      At the beginning of the interview, Ms. Raia stated that she preferred to hire someone with a human resources background for the position. Ms. Baylor, but not Mr. Benson, possessed an extensive professional and educational background in human resources and the specific experience required for the job. Ms. Raia's comments and earlier actions demonstrated that she and the Board management had pre-selected Mr. Benson for the job, because he was Caucasian.

38.      Upon information and belief, Board policy obligated the Hiring Manager, Ms. Raia, to develop the panel interview questions. However, in this instance, Ms. Sawyer, Mr. Benson's coworker in the Staffing Department whom he asked to manage the job posting, drafted the questions and provided them to Ms. Raia. Upon information and belief, Mr. Benson had access to the interview questions prior to his panel interview, which was a violation of the Board's procedures.

39.      Ms. Sawyer did not provide the interviewers a mandated list of questions, but rather, provided a questionnaire packet which permitted the panelists to select one of two questions of their own choosing per page. This allowed the panel to ask Ms. Baylor and Mr. Benson different interview questions, which violated the Board's fair interview practices.

40.      The interviewers did not elicit information about Ms. Baylor's technical abilities, financial and analytical knowledge base, or relevant work experience. Rather, because they knew that Mr. Benson lacked many of these characteristics, they focused their questions only on the candidates' soft, behavioral competencies, to downplay Ms. Baylor's strengths and

make him look more competitive, even though he did not possess the essential requirements for the job.

41.         Despite the panel's approach, all interviewers agreed that Ms. Baylor performed successfully during her interview.

42.         At the conclusion of Ms. Baylor's interview, Ms. Raia told her that she needed to interview additional candidates and would make a hiring decision in a couple of weeks.

43.         On November 3, 2011, the panel interviewed Mr. Benson.

44.         Upon information and belief, in addition to the questions the Board asked Ms. Baylor, it also asked Mr. Benson supplemental questions to advantage him unfairly for the position. Those questions specifically sought to elicit information about Mr. Benson's technical skills, knowledge, and financial experience.

45.         On November 3, 2011, following Mr. Benson's panel interview, he met one-on-one with Mr. Futrell, one of the interviewers. During their meeting, Mr. Futrell asked Mr. Benson additional questions in follow up to his panel responses and further elaborated about the duties of the position.

46.         None of the interviewers provided Ms. Baylor an additional one-on-one interview or the opportunity to further discuss her interview responses, in order to supplement or make her application stronger.

47.         After Mr. Benson's second interview with Mr. Futrell, Ms. Raia offered Mr. Benson the position.

48.         On November 7, 2011, Ms. Sawyer further violated the Staffing Department's policies and procedures when she requested that Brian Deming, a Caucasian male and Senior Compensation Specialist, determine Mr. Benson's new salary, based on her erroneous service

calculations. The Compensation Specialist for Management Division positions was Veronica Tinsley, an African American female. Ms. Tinsley's back-up was Compensation Specialist Angela Henderson, also an African American female. Ms. Sawyer bypassed both of them in favor of Mr. Deming.

49.     On November 16, 2011, Ms. Raia told Ms. Baylor that she had hired Mr. Benson. During their conversation, Ms. Raia told Ms. Baylor she selected Mr. Benson because of his education and his prior work experience in finance.

50.     However, Mr. Benson possessed no prior work experience in finance.

51.     Ms. Raia commended Ms. Baylor's work ethic and performance, and suggested that she consider a position as a Division Administrator ("DA"). Ms. Raia did not suggest, or even mention, any career paths other than that of DA.

52.     A DA position at the Board was akin to a high-level clerk, and those who occupied the position tended to have little or no advanced education. The DA role did not offer challenging responsibilities, opportunity for advancement, or professional growth. Historically, African American females have filled the Board's DA positions. In fact, at the time of Ms. Raia's statement, every African American on her staff was a DA. Therefore, Ms. Raia was attempting to pigeonhole Ms. Baylor in the racially segregated position of DA so that she would no longer advance at the Board.

53.     Ms. Raia further stated that Ms. Baylor reminded her of a "little" version of Sina James, one of the female African American DAs in Ms. Raia's chain of command.

54.     Ms. Baylor does not physically resemble Ms. James. The only trait they bear in common is their race.

55.     Ms. Raia stated that other employees believed Ms. James was a "pain in the

ass," but she paid attention to detail.  Shocked by Ms. Raia's stereotyped and disparaging views

of African Americans, Ms. Baylor did not respond.

56.     On November 17, 2011, Ms. Sawyer informed Ms. Baylor of her non-

selection, as the recruiter for the position.  Ms. Sawyer stated that Mr. Benson's "separate

interview" with Mr. Futrell "pushed him over" and significantly contributed to his selection.

Neither Ms. Raia nor Board management provided Ms. Baylor the opportunity of a "separate

interview."

57.     Four days later, on November 21, 2011, Gioia Wallace, an African American

and the Board's Leading Recruiting Specialist, asked Ms. Baylor how she was handling her non-

selection.  Ms. Wallace told Ms. Baylor that Mr. Benson did not satisfy the minimum

requirements for the position because he did not possess the requisite years of specific

experience.  Ms. Wallace also told Ms. Baylor that the Board's selection of Mr. Benson was

discriminatory, and that she (Ms. Wallace) had reported the discrimination to Michell Clark,

then-Deputy Director of the Board's Management Division and the Acting Chief of Human

Resources, because she was tired of witnessing the Board's discriminatory hiring practices.  Mr.

Clark took no action to remedy the discrimination.

58.     Subsequently, the Board instructed Iyatokunbo Oladitan, an African American

and the Board's Senior Compensation Specialist, to process Mr. Benson's promotion.  Ms.

Oladitan also objected and stated that she felt uncomfortable processing the personnel action

because Mr. Benson did not possess the requisite years of experience.

59.     On November 25, 2011, Ms. Baylor consulted the Board's Equal Employment

Opportunity (EEO) Programs Office about her discriminatory non-selection.  She detailed her

complaint that the Board treated Mr. Benson preferentially on account of his race and did not

promote her on the basis of her race. She filed a pre-complaint on December 1, 2011, and was

assigned an EEO officer.

60. On December 1, 2011, Ms. Sawyer forwarded Ms. Baylor an evaluation form

from Ms. Raia. In the form, Ms. Raia stated she did not select Ms. Baylor due to "Specialized or

related experience" and "Special skills or knowledge." Ms. Raia further said Mr. Benson "was

able to demonstrate a stronger education and work background in the kind of qualitative analysis

the job entails," even though Mr. Benson possessed no specific experience and admitted his lack

of qualifications for the position.

61. Sometime after November 25, 2011 and before December 5, 2011, Deputy

Director Clark met with Ms. Raia and Debra York, Staffing Supervisor, to discuss Ms. Baylor's

claim of discrimination and devise a "damage-control" plan.

62. After the meeting, Ms. York decided to deactivate Ms. Baylor's PeopleClick

account on December 5, 2011, to block her access to the Board's human resources data during

the pendency of her complaint. But for Ms. Baylor's protected activity, Ms. York would not

have deactivated her account.

63. Ms. Baylor required access to the PeopleClick system to perform her duties as

a back-up Report Writer for the Staffing Department, so the deactivation of her account

essentially prevented her from performing those responsibilities. This was an act of retaliation

for Ms. Baylor's filing of a race discrimination complaint.

64. Although the Board subsequently tried to justify its deactivation of Ms.

Baylor's account by claiming that it eliminated the access of all "interviewers," Ms. Baylor was

not and never has been an "interviewer." To the contrary, the Board granted her access as a

back-up Report Writer.

65.     Mr. Martin later admitted that the Board should not have deactivated Ms. Baylor's account because she was a back-up Report Writer.

66.     Following the Board's discriminatory non-selection of Ms. Baylor and subsequent retaliation against her, Ms. Baylor transferred to a position outside of the organization. Nonetheless, Ms. Baylor has sustained, and continues to sustain, economic, and non-economic injuries due to the Board's illegal action.

67.     Ms. Baylor has exhausted her administrative remedies.

## COUNT I – RACIAL DISCRIMINATION IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §§ 2000e *et seq.*

68.     Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 67 above, as though restated herein.

69.     Plaintiff is an African American who began employment with the Board in October 2006.

70.     In October 2011, Plaintiff applied for promotion to the position of Program and Financial Analyst at the FR-23/24 level.

71.     Defendant determined that Ms. Baylor was qualified for the position but refused to promote her because of her race. Rather, Defendant selected the only other candidate for the position, Mr. Benson, a Caucasian who did not satisfy the minimum job requirements.

72.     The Board knew Mr. Benson did not satisfy the minimum requirements and therefore falsely inflated his prior experience to give the appearance that he was qualified, to avoid hiring Plaintiff.

73.     The Board engaged in discrimination during the hiring process when it provided Mr. Benson preferential treatment because of his race by calculating his work experience in a more favorable manner, providing him early access to the interview questions,

asking him supplemental questions designed to elicit information about his technical knowledge, skill, and experience, and affording him a second interview with Mr. Futrell.

74.     The Board further engaged in discrimination when it selected Mr. Benson, who was unqualified for the Program and Financial Analyst position, over Plaintiff, who was qualified, because of her race.

75.     The Board's refusal to select Plaintiff for the position for which she was the only qualified candidate and its attempt to pigeonhole her in a position historically occupied by minority employees constituted unlawful discrimination against Plaintiff on the basis of her race.

76.     As a result of Defendant's discriminatory non-selection of Plaintiff, Plaintiff has suffered past and future economic losses, lost benefits, emotional distress, and pain and suffering.

## COUNT II – RETALIATION IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §§ 2000e *et seq.*

77.     Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 76 above, as though restated herein.

78.     Plaintiff engaged in protected activity under Title VII when she opposed and reported Defendant's preferential treatment of Mr. Benson and its discriminatory non-selection of her to the Board's EEO office on November 25, 2011, and filed a pre-complaint on December 1, 2011.

79.     Sometime after November 25, 2011 and before December 5, 2011, Ms. Raia and Ms. York learned of Plaintiff's protected activity.

80.     In retaliation for Plaintiff's protected activity, Defendant terminated Plaintiff's access to the PeopleClick system, to block her access to data about Defendant's personnel decisions.

81.     Defendant's retaliatory actions precluded Plaintiff from performing her duties as a back-up Report Writer and constituted retaliation in violation of the Title VII, 42 U.S.C. § 2000e-3(a).

82.     Defendant's removal of Plaintiff's duties as a back-up Report Writer and retaliation against her caused Plaintiff to sustain substantial damages in the form of humiliation, embarrassment, and emotional distress.

83.     After Plaintiff protested Defendant's racial discrimination against her and filed an EEO pre-complaint, Defendant engaged in intentional, willful retaliation against Plaintiff in bad faith, and with reckless disregard for her statutory rights under Title VII.

### Prayer for Relief

WHEREFORE, Plaintiff Karen Baylor respectfully requests that this Court grant her the following relief:

1.     Issue a declaratory judgment that Defendant discriminated against Plaintiff on the basis of her race;

2.     Award Plaintiff compensatory and consequential damages to redress the economic injuries she suffered, including back pay for lost wages and benefits and front pay for denial of Plaintiff's expected future earnings;

3.     Award Plaintiff compensatory and consequential damages to redress non-economic injuries she suffered, including pain and suffering, emotional distress, public humiliation, and damage to her professional reputation, in an amount appropriate to the proof presented at trial;

4.     Award Plaintiff the attorneys' fees and the costs she has incurred in bringing this action;

5.      Grant such other relief as this court deems just and necessary.


                                        Respectfully submitted,


Date: December 11, 2017
                                        _____
                                        Lynne Bernabei (D.C. Bar # 938936)
                                        bernabei@bernabeipllc.com
                                        Bernabei & Kabat, PLLC
                                        1400 16th Street, N.W., Suite 500
                                        Washington, D.C. 20036
                                        (202) 745-1942

                                        *Counsel for Plaintiff, Karen Baylor*

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **KAREN BAYLOR**<br>**2908 Naylor Road, S.E.**<br>**Apt. 157**<br>**Washington, D.C. 20020**<br><br>          **Plaintiff,**<br><br>     v.<br><br>**JANET L. YELLEN, CHAIR,**<br>**FEDERAL RESERVE BOARD OF GOVERNORS**<br>**20th & C Streets, N.W.**<br>**Washington, D.C. 20551**<br><br>          **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil No.** _____ |

**PLAINTIFF'S JURY DEMAND**

Plaintiff Karen Baylor, through undersigned counsel, demands a jury trial on all issues so triable.

Respectfully submitted,

Date: December 11, 2017

Lynne Bernabei (D.C. Bar # 938936)
bernabei@bernabeipllc.com
Bernabei & Kabat, PLLC
1400 16th Street, N.W., Suite 500
Washington, D.C. 20036
(202) 745-1942

*Counsel for Plaintiff, Karen Baylor*