UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KAREN BAYLOR, <br>    *Plaintiff*, <br>  v. <br> JEROME H. POWELL, <br>    *Defendant*. | Civil Action No. 17-2647 (TJK) |

**MEMORANDUM OPINION**

  Karen Baylor is an African-American woman who was employed as a benefits administrator for the Federal Reserve System's Board of Governors. She interviewed for a vacant analyst position there, but the Board passed her up in favor of Christopher Benson, a fellow employee who was Caucasian. Shortly after Baylor reported her non-selection to the Board's Office of Diversity and Inclusion, she discovered that the Board had terminated her access to a human resources system, though she had never used that system to do her job. Baylor, proceeding *pro se*, filed this Title VII action for discrimination and retaliation, alleging among other things that she was far more qualified for the position than Benson and that the Board violated various procedures to make sure he was hired. The Board moved for summary judgment, arguing that it did not choose Baylor because it believed Benson was more qualified, that its hiring process was free of discriminatory animus, and that it did not retaliate against Baylor. After closely reviewing the extensive record, the Court agrees with the Board for the reasons explained below and will grant it summary judgment on both claims.

I.     **Background**

Both Baylor and Benson applied for a vacant Program and Financial Analyst (PFA) position in the Management Division of the Federal Reserve System's Board of Governors ("Board") in October 2011. ECF Nos. 56-15, 56-17. The two were the only candidates that a recruiter—another Board employee—forwarded on for further consideration, and both candidates were interviewed by a diverse panel of four Board employees. *See* ECF No. 56-6 ("Raia Aff.") at 1–2; ECF No. 56-7 ("Spriggs Aff.") at 1, 3; ECF No. 56-5 ("Middleton Aff.") at 1–2; ECF No. 56-4 ("Futrell Aff.") at 1. According to the Board, both candidates met the position's minimum qualifications and each had different strong suits. But all four panelists found Benson more qualified, and he was hired shortly after his interview. ECF No. 59-2 ("Raia Depo.") 128:9–15.

The Board's hiring manager, Jacqueline Raia, broke the news of Baylor's non-selection to her. According to Baylor, Raia told her that it was a difficult decision, and that the Board found Benson a better fit because of his "education and work background in finance." ECF No. 59-48 ("Baylor Aff.") ¶¶ 38–41. Raia then recommended to Baylor that she apply to be a Division Administrator ("DA"), a suggestion to which Baylor took offense, because most DAs at the Board were "African-American females with no advanced education," and the role was more administrative in nature than a PFA. *Id.* ¶¶ 41, 42. According to Baylor, Raia also compared her to a "little Sina James," an African-American DA who was "loved," but at the same time considered a "pain in the ass." *Id.* ¶ 43. In December 2011, Baylor alleged that she had been discriminated against to the Board's Office of Diversity and Inclusion. ECF No. 1 ("Compl.") ¶ 59; ECF No. 59-6 at 3. A few days later, she discovered that her access to the Board's "PeopleClick" human resources system was terminated, which she alleges was in retaliation for reporting her non-selection. Compl. ¶¶ 61–65; ECF No. 56-12 ("Martin Decl.") ¶ 25.

Baylor filed this Title VII action in December 2017.[1] The Board moved for summary judgment, ECF No. 56, arguing that its decision to hire Benson over Baylor was not discriminatory and that its termination of Baylor's PeopleClick access was not retaliatory. Baylor opposed, ECF No. 59 ("Opp."), identifying a host of purported procedural irregularities that she says show that Benson was less qualified for the PFA role and that the Board treated him differently to avoid hiring an African-American. The Board replied, ECF No. 62 ("Reply"), and Baylor moved for leave to file a surreply, ECF No. 65. *See* ECF No. 65-1 ("Surreply").

## II.     Legal Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). To survive summary judgment, a plaintiff must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation omitted). Courts "are not to make credibility determinations or weigh the evidence." *Lopez*, 826 F.3d at 496 (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). But the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (quoting

---

[1] Defendant Jerome H. Powell, who assumed office as Chair of the Board in February 2018, is automatically substituted for Janet L. Yellin under Federal Rule of Civil Procedure 25(d).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

"The movant bears the initial burden of demonstrating that there is no genuine issue of material fact." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Id.* And for claims where the non-movant bears the burden of proof at trial, as here, she must make an evidentiary showing "sufficient to establish the existence of [each] essential element to [her] case." *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and therefore entitles the moving party to "judgment as a matter of law." *Id.* at 323. "Importantly, while summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 17 (D.D.C. 2009) (cleaned up). The same is required of *pro se* litigants, whose filings are otherwise construed liberally. *See Cunningham v. U.S. Dep't of Justice*, 40 F. Supp. 3d 71, 82 (D.D.C. 2014).

**III.   Analysis**

"Title VII prohibits federal agencies from discriminating in employment on the basis of [race], 42 U.S.C. § 2000e–16, and from retaliating against employees for the assertion of their rights under Title VII." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003). While Baylor alleges that the Board did both—discriminated against her when it did not select her for the PFA role and retaliated against her for reporting that alleged discrimination, Compl. ¶¶ 68–83—she

has failed to produce sufficient evidence to support either claim. The Board is therefore entitled to summary judgment.

### A.      Discriminatory Non-Selection

"Where, as here, the plaintiff has no direct evidence that the adverse employment action[] of which she complains w[as] caused by prohibited discrimination," the Court applies the *McDonnell Douglas* burden-shifting framework. *Lathram*, 336 F.3d at 1088 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)). That framework first requires Baylor to show that: "(1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications she was rejected; and (4) someone filled the position." *Id.* (cleaned up). The Board does not dispute that Baylor satisfies this minimal burden—she is African-American, she applied and was qualified for the PFA position, and the Board rejected her and chose Benson. In response, the Board must "assert[] a legitimate, non-discriminatory reason for the decision" not to hire Baylor. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). And the Board has met its own burden by asserting that Baylor was less qualified than Benson.[2]

The Court must therefore "resolve one central question," considering "all relevant evidence presented by" Baylor and the Board: Has Baylor "produced sufficient evidence for a reasonable jury to find that the [Board's] asserted non-discriminatory reason was not the actual

---

[2] Baylor argues that the Board's nondiscriminatory reason is so "vague" that it is "the equivalent of offering no reason at all." Opp. at 11 (quoting *Figueroa v. Pompeo*, 923 F.3d 1078, 1092 (D.C. Cir. 2019)). But the Board's explanation as to why it believed Benson was more qualified is more than specific enough to meet its burden under *McDonnell Douglas* because it provides Baylor an "opportunity . . . to rebut the given reason as a pretext." *Figueroa*, 923 F.3d at 1089; *see infra* Part III.A.2 n.8; ECF No. ECF No. 56-4 at 4; ECF No. 56-5 at 5. Indeed, Baylor's argument that the Board was too vague largely contradicts her assertion that the Board "offered [six] different justifications for Plaintiff's non-selection" that she manages to dissect in detail. Opp. at 11–23.

5

reason and that [it] intentionally discriminated against [her] on the basis of race"? *Id.* at 494–95. In other words, has Baylor shown that the Board did not "honestly and reasonably believe[]" that Benson was the more qualified candidate? *Id.* at 496.

In non-selection cases such as this one, an employee may show that her employer's proffered reason was pretextual so as to avoid summary judgment if she was "significantly better qualified for the job than the applicant ultimately chosen." *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 25 (D.C. Cir. 2013) (cleaned up). Or she can, among other things, point to "changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker." *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013) (quoting *Brady*, 520 F.3d at 495 n. 3). Baylor argues that she can show all that and more, but in the end, the evidence here would not allow a reasonable jury to find that when the Board hired Benson for the PFA role, it did so because Baylor is African-American.[3]

---

[3] Baylor also alleges that the Board discriminated against her before it posted the PFA position at issue. Baylor applied for a predecessor PFA position for which she was qualified before the Board cancelled it, reposted it at a grade level above Baylor's, and ultimately hired an Asian-American female for the position instead. Compl. ¶¶ 11–15. But Baylor admits that the cancellation resulted from "organizational changes [that] necessitated recruiting an employee with more experience," ECF No. 59-49 ("P's Resp. to DSOMF") ¶ 2; ECF No. 59-50 ("PSOMF") ¶ 21, and the cancellation affected non-minority candidates for the position as well, ECF No. 56-12 at 1; ECF No. 59-13. Because "a reasonable jury may not infer discrimination . . . [where] 'the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision,'" this incident before her non-selection—considered alone or with the other evidence in the record—does not help Baylor meet her burden. *Salazar v. Washington Metro. Area Transit Auth.*, 401 F.3d 504, 511–12 (D.C. Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)).

1.      **Baylor's Relative Qualifications**

"To prevail on a relative qualifications claim," Baylor "must show that she is '*significantly* better qualified for the job than'" the selectee. *Grosdidier*, 709 F.3d at 25 (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008)). The qualifications gap between candidates must be great enough for a reasonable juror to find it "inherently indicative of discrimination," *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006), whereas "a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998). Indeed, an employer may even select "a candidate who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview," though "purely subjective explanations" are treated with caution if a plaintiff is obviously more qualified. *Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007) (internal quotation omitted).

Courts should "defer to the Government's decision of what nondiscriminatory qualities it will seek in filling [a] position," *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003), "which qualities required by the job . . . it weighs more heavily," *Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006), and whether to consider other credentials or skills "not expressly listed in the job description when the factor was encompassed by the job description," *Jackson*, 496 F.3d at 709. They should "refuse to assess[] the significance of small differences in substantive experience . . . or length of service." *Barnette*, 453 F.3d at 517 (cleaned up); *see also Brown v. Small*, 437 F. Supp. 2d 125, 135 (D.D.C. 2006) ("A court will not second-guess an employer's personnel decision unless the disparities in qualifications are so apparent as to virtually jump off the page and slap it in the face" (quoting *Hammond v. Chao*, 383 F. Supp. 2d 47, 57 (D.D.C. 2005))). In other words, Title VII is not an avenue for courts to serve as "super-personnel

7

departments that reexamine an entity's business decisions," *Stewart*, 352 F.3d at 429 (cleaned up), or to impede employers' "unfettered discretion to choose among qualified applicants," *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

That high bar dooms Baylor's relative qualifications argument on the record here, which includes the PFA job description, Baylor's and Benson's applications and performance reviews, and the interview panelists' evaluations and interview notes.  To begin with, Baylor faces an uphill battle when a diverse panel of four interviewers—including a Hispanic woman, an African-American woman, a Caucasian woman, and a Caucasian man—unanimously agreed that Benson was more qualified for the PFA position.[4]  Raia Depo. 128:9–15; ECF No. 56-40, Baylor Depo. 247:16–19; *see, e.g.*, *Hendricks v. Paulson*, 520 F. Supp. 2d 65, 92 (D.D.C. 2007) ("Most telling in this particular instance of non-selection is that a panel consisting of two African American interviewers and one Caucasian interviewer came to a unanimous decision . . . ."); *Brown*, 437 F. Supp. 2d at 135 n.10.  The panelists found Benson more qualified because he "demonstrated stronger technical skills" in finance and "advance[d] Excel functions,"[5] and he

---

[4] The interview panel that found Benson more qualified included Jacqueline Raia (a Hispanic woman), Kim Spriggs (an African-American woman), Leah Middleton (a Caucasian woman), and Paul Futrell (a Caucasian man).  Raia Aff. at 1, 5; Spriggs Aff. at 1, 6; Middleton Aff. at 1, 5; Futrell Aff. at 1, 3–5.  And while Baylor believes that Raia discriminated against her, she does not believe that about Spriggs, ECF No. 56-40, Baylor Depo. 247:16–19, and her only issues with Middleton and Futrell concern their "irritable" and uninterested demeanor throughout the interview, Baylor Aff. ¶¶ 32–33; ECF No. 66-2 ("D's Resp. to PSOMF") ¶ 97, which does not support an inference of discrimination.  *See Stoe v. Sessions*, 324 F. Supp. 3d 176, 193 (D.D.C. 2018); *Khan v. Holder*, 37 F. Supp. 3d 213, 229 (D.D.C. 2014).

[5] Baylor's argument that the PFA position did not require "advanced" Excel skills conflicts with how the Board advertised the position and with the panelists' individual representations about the skills they were looking for.  ECF No. 56-14 (vacancy posting stating that PFA "[m]ust possess strong computer and Microsoft Office skills, especially Excel"); P's Resp. to DSOMF ¶ 18; ECF No. 59-3, Sawyer Depo. 129:22–130:15, 249:11–15; ECF No. 59-6 at 5.

appeared to display stronger "interpersonal skills" like "teamwork and collaboration." *E.g.*, Raia Aff. at 5; Middleton Aff. at 5; Futrell Aff. at 3; ECF No. 56-20; ECF No 59-6 at 5.[6]

The Court's own review of the record does not show that Baylor was *significantly* more qualified than Benson.[7] Even viewing Baylor and Benson's credentials in the light most favorable to her, she "can only demonstrate that, at best, she was *slightly* more qualified for the [PFA] position." *Bailey v. Washington Metro. Area Transit Auth.*, 810 F. Supp. 2d 295, 304 (D.D.C. 2011) (emphasis added). But that is not enough. Baylor worked for the Board for several years before applying to the PFA job, so it appears she had more work experience than Benson in areas like finance, writing, and human resources; on the other hand, Benson had more formal education in finance, displayed stronger Excel skills, and had familiarity with the Management Division (where the selected PFA would be housed) because he had worked there as a recruiter. The record confirms that both candidates were qualified for the role and reflects

---

[6] The Board argues that its employees' statements to an Equal Employment Opportunity ("EEO") counselor are inadmissible under Federal Rule of Evidence 408(a)(2), Reply at 11 & n.7, and the Court should disregard them for that reason. But "Rule 408 only limits the admissibility of statements made in the course of 'compromise negotiations.' The statements and impressions recorded in the EEO counseling reports that Plaintiff [cites] were not made in the course of negotiations." *Desmond v. Gonzales*, No. 03-1729 (CKK), 2007 WL 9770144, at *2 (D.D.C. Feb. 20, 2007) (cleaned up). Rather, the reports capture witnesses' "initial discussion with an EEO counselor regarding [Plaintiff's] complaint." *Id.* Furthermore, the Court only relies on statements to the EEO counselor to show declarants' "then-existing state of mind," Fed. R. Evid. 803(3).

[7] In trying to boost her relative qualifications and show irregularities in the Board's hiring process, Baylor consistently distorts the record and levies baseless accusations that do not support an inference of discriminatory intent. The Court declines to address each such argument, but they include, for example, that Benson committed fraud in his PFA application; that he was on "probation" at the time of his application; that the Board double-counted Benson's experience; and that two of the interview panelists (who attested to Benson's superior qualifications following their interview) did not actually interview him, based in part on their failure to retain interview notes. *See, e.g.*, Opp. at 10–11; Reply at 4, 5 n.3, 8 n.6, 14–15 & n.10; *Fischbach*, 86 F.3d at 1184.

why the panelists faced a difficult decision weighing these factors. *See* ECF No. 56-20 (Candidate Evaluation Form calling Baylor "a strong candidate for the position"); ECF No. 59-3 ("Sawyer Depo.") 191:4–22 (hiring manager believed it was "a tough decision"). But it is not the Court's role to parse such marginal differences "where it appears the Government was faced with a difficult decision between two qualified candidates." *Stewart*, 352 F.3d at 430. "Although [the Court] recognize[s] [Baylor's] qualifications and her years of distinguished government service, she has failed to show that [the Board's] proffered non-discriminatory basis for [Benson's] selection was pretext for discrimination." *Barnette*, 453 F.3d at 519.

### 2. Consistency of the Board's Reasons for Hiring Benson

Baylor also attacks the Board's "shifting reasons for [her] non-selection." Opp. at 3. "[S]hifting and inconsistent justifications are 'probative of pretext.'" *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (quoting *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001)). But in this case the Board's "overarching rationale" for not selecting Baylor never shifted, *Montgomery v. Gotbaum*, 920 F. Supp. 2d 73, 81–83 (D.D.C. 2013). The interview panel unanimously agreed that Benson was the more qualified candidate, and the Board has maintained that position since Raia first told Baylor that she was not selected. *See* Baylor Aff. ¶ 38; *Hayes v. Sebelius*, 762 F. Supp. 2d 90, 103 (D.D.C. 2011). To be sure, the specific reasons Raia provided Baylor for Benson's superior qualifications—some of which reflect Raia's own thoughts and others which seem to summarize the views of the entire panel—shifted slightly over time, and in different settings.[8] But those reasons are not "inconsistent," *Geleta*, 645 F.3d

---

[8] According to Baylor, on November 16, 2011, Raia told her that the Board found Benson "a better fit because he possessed an education and work background in finance," Baylor Aff. ¶ 38; on Raia's November 30, 2011, candidate evaluation form for Baylor, Raia cited Benson's "education and work background in the kind of qualitative analysis the job entails" and "stronger Excel skills in advance[d] functions," ECF No. 56-20; in December 2011, Raia told the EEO

at 413, or "material," *Kranz v. Gray*, 842 F. Supp. 2d 13, 24 (D.D.C. 2012), such that a reasonable jury would find them "unworthy of credence."[9] *Giles v. Transit Employees Fed. Credit Union*, 794 F.3d 1, 7 (D.C. Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000)).

### 3. The Board's Adherence to its Procedures

Baylor also raises a veritable kitchen sink of supposed irregularities in the Board's hiring process as purported bases for pretext. But none of them, together or individually, and when considered along with the entire record, are sufficient evidence from which a reasonable jury could find that her non-selection amounted to discrimination. An employer's failure to follow its own procedures is relevant, but not enough on its own to show that an employer's reason for not selecting a candidate is pretextual, *Fischbach*, 86 F.3d at 1183, unless the deviation is "unexplained," *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 571 (D.C. Cir. 2019).

---

counselor that in the interview, Benson displayed stronger "Excel and interpersonal skills," ECF No. 59-6 at 5; Raia's March 2012 EEO affidavit referenced Benson's "stronger technical skills" and "experience with the competencies we were looking for," ECF No. 56-6 at 5; and in her March 2019 deposition, Raia stated that Benson better demonstrated "familiarity with the discipline of finance and concepts of budgeting and financial management," as well as "experience with qualitative analysis. And, in particular, the select[ed] candidate Chris had very strong Excel skills." Raia Depo. 129:15–21.

[9] Baylor also tries to show pretext in the Board's consideration of competing candidates' "analytical skills" by juxtaposing (1) the Board recruiter's comments to Baylor that "the selection came down to 'the analytical,'" and (2) the recruiter's decision not to forward an application for the panel's consideration from another African-American candidate who lacked "analytical" skills, with (3) the Board's ultimate selection of Benson, whose cover letter stated that his "recent work experience hasn't allowed [him] to develop . . . analytical and quantitative skill sets." Baylor Aff. ¶ 45; ECF No. 56-15 at 1; *see* Opp. at 8–9; Surreply at 8–9. But Baylor ignores the rest of Benson's cover letter discussing his "classroom experience" that provided an "analytical and quantitative skill set," ECF No. 56-15 at 1, and she misstates the requirements of the PFA role, Reply at 14; D's Resp. to PSOMF ¶ 42. In addition, there is no evidence that the recruiter even knew the other African-American candidate's race when pre-screening her application for the PFA role.

11

Most of Baylor's arguments about procedural irregularities simply ignore the Board's actual procedures. For example, nothing prevented the Board from counting Benson's prior internships or part-time work (as it did) in calculating whether he met the position's minimum qualifications. ECF No. 56-10 ("Deming Decl.") ¶ 24. And while it is unclear whether the Board failed to conduct pre-offer reference checks on Benson as Baylor alleges, the Board does not require such checks for internal candidates. ECF No. 63-4, York Depo. 132:5–18, 270:15–22; *see Chappell-Johnson v. Bair*, 358 F. App'x 202, 203 (D.C. Cir. 2009). In the end, Baylor does not even argue that the Board treated her any differently with respect to these procedures. Instead, she argues that virtually everything the Board did when reviewing Benson's candidacy was suspicious enough to suggest pretext. Not so.

When Baylor does point to legitimately unusual aspects of the hiring process, she fails to rebut the Board's nondiscriminatory reasons for them. She objects to the Board's assignment of Benson's "salary reading" (its calculation about whether Benson met the position's minimum qualifications) to a Caucasian compensation specialist, Brian Deming, instead of one of two African-American specialists in the same organizational component; Baylor argues that this assignment "circumvented established workflows." ECF No. 59-50 ("PSOMF") ¶¶ 128–29. But she does not dispute Deming's explanation that he was the "only compensation specialist . . . able to perform salary readings for positions in the Management Division" because he had the software training and license necessary to calculate "market-based pay" under the pilot program in place then, Deming Decl. ¶¶ 16-18; *see* ECF Nos. 56-23, 56-24; there is no merit to her myriad gripes with the substance of that salary reading, *see, e.g.*, Deming Decl. ¶¶ 19–22, 26;

ECF No. 62-4; ECF No. 66-2 ("D's Resp. to PSOMF")[10] ¶¶ 63, 124–25; ECF No. 63-4, York Depo. 50:17–51:3; Sawyer Depo. 60:19–61:5; and for what it is worth, there is no evidence that Deming even knew Baylor's race, let alone that he harbored racial animus, *see* ECF No. 56-40, Baylor Depo. 68:11–12, 251:6–8, 251:13–17; *Evans*, 716 F.3d at 622.

Baylor also raises a host of purported irregularities with the candidates' interviews, none of which support an inference of discrimination in her non-selection. *See Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005); *Stoe v. Sessions*, 324 F. Supp. 3d 176, 192 (D.D.C. 2018). In particular, Baylor argues that the Board afforded a "second" or "follow-up" interview—which "rarely" occurs—to Benson but not to her. D's Resp. to PSOMF ¶ 116. Although the recruiter told Baylor that the encounter seemed to have "pushed [Benson over] for selection," D's Resp. to PSOMF ¶ 105, it appears that it was nothing more than informal, follow-up questions from one of the interviewers, asking Benson to elaborate on something he said to the full panel. Compl. ¶ 45; D's Resp. to PSOMF ¶ 113; Futrell Aff. at 3; Raia Aff. at 3–4; Spriggs Aff. at 5. Interviews are a give and take, and interviewers may ask follow-up questions—even outside the presence of the rest of an interview panel—without courts acting as "super-personnel departments" and imputing animus from such an innocuous practice. *Stewart*, 352 F.3d at 429; *see Fields v. Vilsack*, 798 F. Supp. 2d 82, 90–92 (D.D.C. 2011); *Gonzales v. Holder*, 656 F. Supp. 2d 141, 148 (D.D.C. 2009). *Contra Iyoha*, 927 F.3d at 571–72.

---

[10] Baylor moved to strike the Board's first response to her statement of material facts and to "deem as admitted all facts contained in [her] [s]tatement," ECF No. 64 at 3, because the Board declined to admit or deny several facts, *id.* at 2. Instead, the Board generally denied that the "paragraph[s] identif[y] any material facts in dispute." ECF No. 62-1. The Court will deny as moot the Motion to Strike, ECF No. 64, because the Board attached in its opposition to the Motion a revised response that cures all the deficiencies raised by Baylor. The Court treats the revised response, ECF No. 66-2, as the Board's response to Baylor's statement of material facts in dispute.

At most, the evidence may show that the Board informally pre-selected Benson for the PFA role before Baylor had even applied, but not that the Board did so because Baylor is African-American. *See* ECF No. 59-6 at 3. And even "if there had been favoritism in [the] selection process, courts have held that '[p]reselection . . . does not violate Title VII when such preselection is based on the qualifications of the party and not on some basis prohibited by Title VII.'" *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 310 (D.D.C. 2005) (quoting *Goostree v. Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986)). Indeed, a few months before the Board posted the PFA role in the Management Division, "Raia asked . . . Benson's supervisor, Debra York . . . to appoint [Benson] as the sole full-time recruiter for the Management Division," D's Resp. to PSOMF ¶ 5, after which he spent most of his time "embedded" in the Division working on Raia's floor. ECF No. 59-16 at 7; Raia Depo. 65:5–18; ECF No. 59-4, York Depo. 77:13–78:7. Benson was thus the recruiter first assigned to fill the PFA job before he stepped aside to apply for it himself. ECF No. 59-6 at 5; *see also* Sawyer Depo. 143:8–16 (noting that Benson "was not th[e] sole or primary recruiter for the division").[11] Ultimately, even if the Board pre-selected Benson, it would not show unlawful discrimination when the only record evidence on the issue suggests that it did so because the hiring manager was more familiar with him and the Board believed he was performing well in the Management Division. *See, e.g.*, ECF No. 59-16 at 7 ("Chris has done a great job taking on full-scope recruitment duties."); ECF No. 56-14 (vacancy

---

[11] As a Board recruiter, Benson had access to the Board's pool of interview questions and behavioral "competencies," though the interview panel selected the specific questions for him and Baylor after he was no longer the assigned recruiter, and there is no evidence that the panel shared those questions with him before his interview. *See* Sawyer Depo. 32:18–19, 33:7–9; ECF No. 59-4, York Depo. 55:14–56:10, 234:10–235:9, 243:2–4; D's Resp. to PSOMF ¶ 83; *see also* ECF No. 59-24 at 3–12, 16–25.

14

posting noting a preference for candidates with an "understanding of the kind of work performed in the Management Division").

### 4.     The Board's Treatment of Minority Employees

Next, Baylor fails to show pretext through the Board's treatment of other minority employees. She speculates that when Raia appointed Benson as the Management Division's recruiter, he "displaced" an African-American recruiter; but the uncontroverted evidence shows that the recruiter was moved for performance issues before Benson was ever recommended for the division. PSOMF ¶ 9; Surreply at 10–11[12]; *see* Reply at 16; D's Resp. to PSOMF ¶ 9. And she relies exclusively on inadmissible hearsay (in the form of office gossip) to argue that the recruiter for the PFA position would not "consider external applicants who have 'foreign names,' because she assume[d] they were not United States citizens." Compl. ¶ 21; Baylor Aff. ¶ 27; ECF No. 59-1, Baylor Depo. 100:8–12; *see Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007). Neither argument comes close to supporting an inference of unlawful discrimination.

### 5.     Raia's Alleged Discriminatory Statement

Lastly, Baylor accuses Raia of harboring racial prejudice because of comments she made while informing Baylor of her non-selection. Raia compared Baylor to "a little Sina James," another African-American employee of the Board; but according to Baylor, she did not resemble James, and James worked as a "Division Administrator" (DA), a role that is "administrative and clerical in nature" and mostly occupied by "African American females with no advanced education." Baylor Aff. ¶¶ 41–43; D's Resp. to PSOMF ¶ 151. These comments, unlike those that are racially insensitive on their face, *cf. Evans*, 716 F.3d at 622, do not support an inference

---

[12] The Court will grant Baylor's Motion for Leave to File Surreply in Opposition to Defendant's Reply in Support of Motion for Summary Judgment, ECF No. 65, because the surreply helps clarify which issues are genuinely disputed.

of racial discrimination in Baylor's non-selection—even viewed in the light most favorable to Baylor—when considered in context and along with the entire record. *See Iyoha*, 927 F.3d at 568.

According to Baylor, Raia told her that Benson was a better fit for the PFA role, "claimed the hiring decision was hard for everyone," and "continued by saying how great of an employee [Raia] knows" she is. Baylor Aff. ¶¶ 38–41. Raia told Baylor she "would make a great DA," which Baylor "instantly took offense" to because she wanted "an analyst position to match [her] analytical skills sets." *Id.* ¶¶ 41–42. Raia then noticed Baylor's bewilderment and acknowledged that she knew Baylor did not want to become a DA, yet "continued pushing the recommendation by saying [Baylor] had the qualities to be a great DA." *Id.* ¶ 42. Finally, Raia told her that she "reminded [Raia] of a 'little Sina James'"; when Baylor asked her to clarify, "Raia said employees felt Ms. James was 'a pain in the ass,' but she paid attention to detail, which is why she was loved." *Id.* ¶ 43; *see also* D's Resp. to PSOMF ¶¶ 146, 150. The conversation between the two is largely undisputed. Raia, for her part, acknowledges observing that Baylor and James shared an "attention to detail," but denies referring to James as a "pain in the ass." Raia Depo. 177:21–178:8.

To be sure, the record shows why these comments would upset Baylor, especially when paired with receiving the news that she had not been selected for the PFA job. If Raia thought Baylor paid "attention to detail," she could have selected Baylor for the PFA position, which listed "[a]ttention to detail" as "a must." ECF No. 56-14; Opp. at 26; *see also* ECF No. 56-17 at 1 (Baylor's cover letter noting she "possess[ed] a keen attention to detail"). Instead, Raia recommended that Baylor apply for the DA role, which is where "all African American employees on [Raia's] staff were assigned," D's Resp. to PSOMF ¶ 148, and which had a lower

16

grade-level ceiling for promotion than the PFA role, ECF No. 59-49 ("P's Resp. to DSOMF") ¶ 30.[13] Baylor also "bore no physical resemblance" to James, D's Resp. to PSOMF ¶ 151; she was not "little" in stature, Baylor Aff. ¶ 43; and it is understandable why she would not have appreciated being compared to someone who Raia allegedly said was thought of as a "pain in the ass," *id.*

But not every upsetting remark is enough to raise an inference of discrimination. Viewing Raia's comments alongside "all other evidence" in the record, *Iyoha*, 927 F.3d at 568, they do not support the inference that the Board hired Benson because Baylor is African-American. First, it bears recognizing that Raia was instrumental in Baylor being considered for the PFA opening in the first place; Raia had the discretion to ignore Baylor's late application, but Raia had encouraged her to apply anyway and interviewed her. Reply at 2–3; ECF No. 56-3 at 2 ("Even though the announcement had already closed on October 17, 2011, Jacqui approached me about applying to her position on October 20, 2011. Per her coaxing, I applied the very same day she approached me."); Raia Aff. at 3. Second, Raia made the remarks at issue while explaining to Baylor how hard the decision had been for the Board. Raia told Baylor she was a "strong candidate for the [PFA] position," ECF No. 56-20, and that she was a "great" employee in her role at the time, Baylor Aff. ¶ 41. While these comments alone say little to nothing about whether Raia's motives were discriminatory, there is nothing inherently suspicious about her suggesting another potential promotion for Baylor during such a conversation, and the DA role *did* offer a path for Baylor to advance in her career—although perhaps not as desirable a one as

---

[13] Baylor notes that "nearly 80 percent of administrative support workers" at the Board were African-American when Raia made these comments, Opp. at 25 (citing ECF No. 59-29), though that number says nothing about the applicant pool and on its own does not suggest discrimination. *See Brown v. Small*, 437 F. Supp. 2d 125, 136 (D.D.C. 2006).

17

the PFA role offered. *See* Martin Decl. ¶ 7. Third, Raia told Baylor that she would be a fit for the DA role—and compared her to James—for an explicitly nondiscriminatory reason: her "attention to detail." Baylor Aff. ¶ 43; ECF No. 56-17 at 1. Fourth, there is no evidence that Raia linked the DA position exclusively with African-American employees. While the four African-American employees in Raia's department were all DAs, Raia hired only two of them, and one was a Caucasian male. ECF No. 59-9 at 1; P's Resp. to DSOMF ¶ 29. And finally, there is no evidence that these comments, made after Baylor's non-selection, impacted the unanimous view of the other three panelists that Benson was more qualified for the PFA role. *Cf. Hampton v. Vilsack*, 685 F.3d 1096, 1101 (D.C. Cir. 2012).

"In sum, the [Board] produced evidence of a legitimate, non-discriminatory reason for" Baylor's non-selection: that Benson was more qualified for the PFA role. *Brady*, 520 F.3d at 496. Baylor "failed to put forward sufficient evidence for a reasonable jury to find that the employer's legitimate, non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against [her] on the basis of race." *Id.* at 497. The Board is therefore "entitled to judgment as a matter of law" on Baylor's claim of discriminatory non-selection. Fed. R. Civ. P. 56(a).

**B.    Retaliation**

Baylor claims that the Board retaliated against her for reporting her discriminatory non-selection to the Board's Office of Diversity and Inclusion by "terminat[ing] Plaintiff's access to the PeopleClick system." Compl. ¶ 80; Opp. at 35. A claim for retaliation under Title VII requires a plaintiff to show a "materially adverse action by [her] employer," *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009), that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination," considering "all the circumstances," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 71 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d

1211, 1219 (D.C. Cir. 2006); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Baylor's loss of PeopleClick access was not a materially adverse action. The Board's PeopleClick system "maintained sensitive human resources data," and at first, the Board gave Baylor PeopleClick access and training so she could back up the employee responsible for generating reports with that system. Compl. ¶¶ 7–8; Martin Decl. ¶¶ 9–10, 16, 19; Baylor Aff. ¶¶ 12, 14. But as it turned out, Baylor never had a reason to use PeopleClick. She admits that not once did the Board ever call on her "to create a query in this particular system" as part of her job responsibilities. ECF No. 56-34; P's Resp. to DSOMF ¶ 66; Baylor Aff. ¶¶ 15–17. Her immediate supervisor "was never . . . informed that Ms. Baylor actually acted in the [back-up PeopleClick] role, and . . . never understood it to be part of [Baylor's] regular or even ad-hoc job responsibilities." ECF No. 56-8 ¶¶ 2, 4. Baylor herself never understood PeopleClick access as important to her job—indeed, she catalogued her job duties and accomplishments to her supervisor the month before she applied for the PFA position, and she did not mention PeopleClick. *Id.* ¶ 7; P's Resp. to DSOMF ¶ 69. To state the obvious, no reasonable employee would be dissuaded from reporting discrimination by losing access to a system that she did not need, let alone ever use, to do her job. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (materially adverse actions typically have "tangible job consequences" (quoting *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 648 (7th Cir. 2005))); *Kline v. Archuleta*, 102 F. Supp. 3d 24, 33 (D.D.C. 2015). Because Baylor cannot show that this action was materially adverse, her retaliation claim fails.

## IV.   Conclusion

For all the above reasons, the Court will grant Defendant's Motion for Summary Judgment, ECF No. 56; deny as moot Plaintiff's Motion to Strike Defendant's Response to

Plaintiff's Separate Statement of Undisputed Material Facts, ECF No. 64; and grant Plaintiff's Motion for Leave to File Surreply in Opposition to Defendant's Reply in Support of Motion for Summary Judgment, ECF No. 65.  A separate order will issue.

/s/ Timothy J. Kelly  
TIMOTHY J. KELLY  
United States District Judge

Date: April 29, 2020